**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Francisco ARROYAVE et al.,**
**Defendants-Appellants.**

**No. 72–1800.**

United States Court of Appeals,
Fifth Circuit.

April 13, 1973.

———◆———

George B. Weires, Miami, Fla., Court appointed, for Arroyave.

Gino P. Negretti, Miami, Fla., for Posada.

Shaya Estrumsa, Miami, Fla., for Barragan.

Robert Rust, U. S. Atty., Michael P. Sullivan, Lawrance B. Craig, III, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before GEWIN, GOLDBERG and DYER, Circuit Judges.

GEWIN, Circuit Judge:

On January 13, 1972, a three count indictment was returned charging the appellants, Barragan, Posada, and Arroyave with: (1) a conspiracy to import and possess marijuana; (2) the actual importation of marijuana; and (3) possession of marijuana with intent to distribute.[1] On February 14, 1972, at the conclusion of their trial, the jury found Barragan guilty of all three counts; Posada guilty of counts one and two; and Arroyave guilty of count one. They appeal from their convictions. We affirm the convictions of Barragan and Posada but for reasons later delineated are compelled to reverse the conviction of Arroyave.

On December 1, 1971, a government agency informed the United States Customs Bureau in Miami that marijuana might be smuggled into the United States aboard Colombian Air Force planes landing at the Fort Lauderdale-Hollywood International Airport. On December 21st, agents of the Custom's Bureau received notice that a Colombian Air Force plane had landed at the airport at 3:00 p. m. Pursuant to this information, agents secretly surveilled the activities of this aircraft.

The aircraft was inspected and cleared by Customs after a general declaration had been presented by the flight crew. No marijuana was discovered at the time of clearance. After inspection, the aircraft was removed to the Colombian Air Force Purchasing Agency warehouse where workmen began to remove several large pieces of heavy machinery.

Agents DeGaglia, Mason, and McCutcheon secretly stationed themselves nearby to monitor the activities in and around the plane. After the heavy corgo had been removed the aircraft cargo doors were partially closed thus limiting the agents' view from the waist up of the persons inside the plane. Agent Mason testified that he saw Barragan reach above his head and place two rope-tied packages between himself and Posada. Agent DeGaglia testified that Posada carried these two packages and placed them in the bed of his pickup truck.

Posada returned to the aircraft and again retrieved two more packages. Posada took the two packages and walked over to Arroyave and engaged him in a short conversation. Posada then walked to his pickup truck, placed the packages in the bed of the truck, and proceeded to leave the warehouse area. Agent DeGaglia pursued Posada and stopped the vehicle within the airport grounds. He informed Posada that he was an agent of the Customs Bureau and then opened the packages. A field test conducted by DeGaglia revealed the packages contained marijuana. Posada was immediately arrested and the contraband seized.

After the marijuana was discovered in Posada's truck, other agents arrested those in and around the aircraft. A

---

1. See, 18 U.S.C. § 2 and 21 U.S.C. §§ 841(a)(1), 952(a).

careful search of the plane yielded several other packages containing marijuana. There is some evidence that when Barragan was placed under arrest at the warehouse he requested to see the Colombian Consul. This request was apparently denied by the agents.

After his request, Barragan was taken to the Customs Agency Service office in downtown Miami. There Agent Perez, who speaks Spanish fluently, proceeded to advise Barragan of his *Miranda* protections by reading the *Miranda* rights to him from a card which was written in Spanish. Barragan responded that he understood his rights but preferred to waive them.

Barragan then proceeded to make a full confession. He stated that he knew the packages contained marijuana and he was to be paid 6,000 Colombian pesos for bringing the contraband to the United States from Colombia. He further admitted that he was to deliver the packages to various people at the airport and indeed had delivered four packages to a man who was driving a pickup truck. These are essentially the facts utilized by the government in its case which resulted in the convictions now under review.

Several contentions are presented which the appellants argue mandate a reversal of their convictions. Each challenges the sufficiency of the evidence; the make-up of the jury panel; and, certain comments by the district judge which allegedly predisposed the jury to an atmosphere of guilt. Other errors are presented which pertain more particularly to each individual appellant.

### I. Jury Selection

■ Appellants urge that they were denied a fair trial since the jury selection system. allegedly excludes citizens between the ages of eighteen and twenty-one years and a proportionate per-

centage of Latin Americans. We find these contentions to be without merit. This court has previously reviewed the plan of the United States District Court for the Southern District of Florida for the Random Selection of Grand and Petit Jurors. Concerning this plan, our previous observations are equally decisive on the contentions presented here. We have stated that:

. . . there was no showing of a substantial noncompliance in that, considering the population of the District and the size of the master wheel, it was "practicable" (as the Plan phrases it) to have added the names of newly registered voters or that the absence of them could have produced any substantial effect on the fair cross-section concept.[2]

Likewise, appellants have also failed to show that it was practical to add the names of newly registered voters.

■■ At trial, appellants requested the court to take judicial notice that the proportion of Latin Americans on the jury panels did not equal their population in the general Miami area. This the trial court properly refused to do. Appellants made no attempt to prove these assertions. The burden is on the appellants to demonstrate the exclusion of a particular group from jury service.[3] As the record reveals, the appellants never even attempted to fulfill this burden. Their argument that Latin Americans have been excluded from jury service is totally without merit.

### II. Prejudicial Comments

■ Appellants further assert that reversal of their convictions is required· because of certain allegedly prejudicial comments made by the trial court which predisposed the jury to an atmosphere of guilt. A review of the record, however, reveals that only two of these comments were actually made in the pres-

2. United States v. Pentado, 463 F.2d 355, 359 (5th Cir. 1972). See also, United States v. Blair, 470 F.2d 331 (5th Cir. 1972).

3. Whitus v. Georgia, 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967).

ence of the jury. We accordingly limit our review to these comments.

As part of their defense, appellants presented evidence that it was possible that the marijuana could have been placed aboard the aircraft *after* it landed at the airport. In furtherance of this defense, appellants questioned Mr. Smith, a customs inspector, who initially cleared the aircraft on its arrival. Smith testified that he had discovered no marijuana during his inspection. The following colloquy then ensued:

Mr. Estrumsa: I have no further questions.

The Court: How did you overlook 240 pounds of marihuana? [sic] Was it careless, or—

Mr. Estrumsa: I object, your Honor, to these remarks, because it might very well have been possible, sir, that the marihuana—[sic]

The Court: I said did he overlook 240 pounds. The jury will determine whether it is possible or not. Everything is possible.

The Witness: I don't know.

The Court: Did you see the airplane leave the ground after you inspected it.

The Witness: No, I did not.

Additionally, during the government's closing argument, the trial court warned Barragan's counsel that his continued objections to the government's closing argument might prove to be an unwise courtroom tactic. The court stated after several objections by defense counsel to the government's summation that:

He [Government counsel] may play tricks on you and interrupt you every five minutes . . . He might do it to you, if you interrupt him.

Appellants now claim that these comments require reversal.

Looking at the record as a whole,[4] we do not believe that these two encounters could have possibly led the jury to a predisposition of guilt. The court properly advised the jury in accordance with the rule in this circuit that it was their exclusive function to determine whether the marijuana was in fact imported.[5] Likewise, the court's advisement after counsel's incessant objections to the government's summation was an attempt to keep the jury from becoming confused. The court advised counsel that he would be given an opportunity to present his interpretation of the facts and summary of the case. The reaction of the court did not suggest the appellants' guilt.

### III. Barragan

Before responding to Barragan's sufficiency of the evidence claim, a review of the propriety of admitting his prior confession is proper since the evidence adduced from this confession was the most direct and damaging in the government's case. It appears that after Barragan was arrested at the warehouse, he requested to see the Colombian Consul. This request was denied and he was taken to the customs office in downtown Miami where he was apprised of his *Miranda* protections.

■ Barragan responded that he understood his *Miranda* protections but did not desire an attorney. At this time he did not make a request to see the Colombian Consul. Instead, he proceeded to make a full confession. Barragan admitted at trial that he was not coerced or threatened in any manner during his interrogation. He did state that he was a little nervous but such a reaction is quite normal and surely is not grounds for holding that an otherwise permissible confession is somehow tainted.

■ Since it is abundantly clear that the confession at the customs office was voluntary and otherwise admissible, the only issue to which we need address our-

4. See United States v. Penner, 425 F.2d 729, 730 (5th Cir. 1970).

5. "Thus the rule in this Circuit is clear: if the trial judge chooses to comment on the evidence he must instruct the jury that they are not bound by his comments or questions." United States v. Musgrave, 444 F.2d 755, 762 (5th Cir. 1971); see also, Hale v. United States, 435 F.2d 737, 742 (5th Cir. 1970); Bursten v. United States, 395 F.2d 976, 982 (5th Cir. 1968).

selves is whether the government must cease any further interrogation when a foreign national requests to see his country's consul upon his arrest. The assertion of a desire to see the Colombian Consul was at most an ambiguous request. The motivation for this request is unknown. It does not share the specific connotations necessarily involved in the request for *counsel*. To conclude that such requests would invoke *Miranda* protections would unnecessarily and unwisely broaden the purpose of the *Miranda* decision.[6]

Barragan did not continue to request assistance of the Columbian Consul when Agent Perez informed him of his *Miranda* rights at the customs office. Perez did inform Barragan that he was entitled to counsel and if he could not afford to retain an attorney, then one would be appointed for him. Barragan responded that he understood his right to counsel but voluntarily waived such right. This gives added weight to the supposition that the original request for the Colombian Consul was not for the purpose of obtaining the assistance of an attorney within the rationale and teachings of the *Miranda* decision.

■ Since the confession was properly admitted, Barragan's argument that there was insufficient evidence to convict is without merit. Barragan stated in his confession that he brought the marijuana into this country; he was to be paid 6,000 Colombian pesos for his task; he was to deliver it to certain people at the warehouse; and he in fact delivered four packages to a man driving a pickup truck. In addition to the incriminating evidence adduced from the confession, the agents testified that they saw Barragan give four packages to Posada who was driving a pickup truck. We feel that this is ample evidence to

sustain the jury's verdict of guilty. Barragan's other contentions are totally without merit.

## IV. Posada

■■ Posada claims that the search of his pickup truck violated his fourth amendment rights. He argues that the search was neither a customs or border type search. The contention that this was not a proper border search is totally frivolous. The agents testified that they saw Barragan give Posada several packages from a plane which had recently arrived in the United States. This Court has already held that a search need not occur at the border to be upheld as a border search.[7] It is also unnecessary for the person to actually cross the border before he may be searched.

> The class of persons who may be subjected to a border search . . . (include) persons engaged in suspicious activity near a border area . . . Therefore, we hold that when . . . an individual's movements are reasonably related to the border area, . . . that individual is a member of the class of persons that a customs officer may . . . stop and search . . .[8]

The search of Posada's pickup truck was a proper border search and the contraband seized was admissible at his trial.

■ It is our opinion that the agents' testimony that they saw Barragan give Posada the packages, the later seizure of the marijuana from his pickup truck, together with all the circumstances surrounding the handling and movement of the contraband, constituted sufficient evidence to sustain Posada's conviction of a conspiracy to import marijuana. Since Posada was sentenced to concurrent two year sentences under

6. Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L.Ed.2d 694 (1966).

7. United States v. Thompson, 475 F.2d 1359 (5th Cir. 1973). See, United States v. Reagor, 441 F.2d 252 (5th Cir. 1971).

8. United States v. Glaziou, 402 F.2d 8, 13–14 (2nd Cir. 1968); United States v. Hill, 430 F.2d 129, 131 (5th Cir. 1970).

both counts, we need not review his conviction for actual importation.[9]

## V. Arroyave

■ After a careful review of the trial transcript, we conclude that the government did not present sufficient evidence to support Arroyave's conviction. Viewing the evidence in a light most favorable to the government,[10] the evidence proved that: Arroyave was a friend of Posada and the latter's truck had been seen at Arroyave's home on several occasions; on the day in question, Arroyave was milling around the aircraft and talking momentarily to Posada. We conclude as a matter of law that the evidentiary foundation relied upon by the Government is much too flimsy and insubstantial to support a guilty verdict of conspiracy to import marijuana.

■ Such a conclusion would stand for the impermissible proposition that one may be convicted of conspiracy on the mere association with others. The government's evidence was purely circumstantial. In such case, it is incumbent upon the government to exclude every reasonable hypothesis except that of guilt.[11] A cursory examination of the record in this case manifestly reveals that the government has failed in this regard.

Arroyave was a former employee of the Colombian Air Force. He unloaded air craft as it arrived at the warehouse. Stella Urrea, a secretary employed by the Colombian Warehouse, testified that on the day in question she called Arroyave and informed him that he would have to come out to the warehouse office to fill out some forms to qualify for a Christmas bonus check to which he was entitled. This is surely a plausible explanation for Arroyave's presence at the warehouse on December 21, 1971. It is not unreasonable to believe that after he came to the warehouse he decided to renew old acquaintances and engage in some holiday revelry with his friends.

This Court has previously stated in circumstantial evidence cases that:

There is ample cause for suspicion and conjecture in this case, but suspicion and conjecture are not sufficient to sustain a conviction. In our view the jury was not justified in reaching a verdict of guilty, even though they accepted the Government's evidence as true and accorded it full weight.[12]

This summation is equally applicable to the government's case against Arroyave.

Accordingly, it is our conclusion that the district court committed error in denying Arroyave's motion for acquittal because as a matter of law, there was insufficient evidence of his guilt to submit the case to the jury. No purpose would be served by ordering a new trial in this case since the record fails to reveal the probability of a subsequent conviction. As we have often said, "No good purpose could be served in ordering a new trial" in this case.[13]

The judgment of conviction of Arroyave is reversed, and his case is remanded to the district court with directions to vacate the judgment and to enter an order granting the motion of acquittal and a judgment acquitting Arroyave. In all other respects, the judgment of the district court is affirmed.

Affirmed in part and reversed and remanded in part with directions.

9. Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); United States v. Abigando, 439 F.2d 827 (5th Cir. 1971).

10. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); Weaver v. United States, 374 F.2d 878 (5th Cir. 1967).

11. Vick v. United States, 216 F.2d 228, 232 (5th Cir. 1964).

12. Montoya v. United States, 402 F.2d 847, 850 (5th Cir. 1968).

13. See, United States v. Stephenson, 474 F.2d 1353, (5th Cir. 1973); United States v. Love, 472 F.2d 490 (5th Cir. 1973); Nagell v. United States, 392 F.2d 934 (5th Cir. 1968); Argent v. United States, 325 F.2d 162 (5th Cir. 1963).